**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FORT SMITH DIVISION**

**WILLIAM WHITFIELD HYMAN and**
**NATALIE HYMAN**                                                            **PLAINTIFFS**

**V.**                            **CASE NO. 2:18 CV-2138**

**THE CITY OF WALNUT RIDGE, et al.**                          **DEFENDANTS**


**PLAINTIFFS' BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS COMPLAINT**

COMES now the Plaintiffs, by and through their attorney, Kesha Chiappinelli, in support of their Response in Opposition to Defendant's Motion to Dismiss Complaint, state:

A. **Government Facebook Pages Are Not Government Speech**

Before addressing the Defendant's reliance on "government speech" for the First Amendment violations, it is important to note that Arkansas Courts have never relied on the "government speech" doctrine in any recorded caselaw to date. Therefore, this defense would not be applicable to the state law claims. The "government speech" doctrine is incredibly limited, and the Supreme Court has recognized the dangers of misuse: "This Court exercises great caution in extending its government-speech precedents, for if private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." Matal v. Tam, 137 S. Ct. 1744, 1748 (2017). With that in mind, the Supreme Court established a three-factor test to determine whether speech was government speech:

1

1) whether the government has a history of using this medium of communication to convey government speech;

2)  whether a reasonable observer would conclude the government was speaking; and

3) whether the government exercises direct control over the message.

<u>Walker v. Texas Div., Sons of Confederate Veterans, Inc</u>., 135 S. Ct. 2239, 2248 (2015).

**i.      Does the Government have a History of Using this Medium to Convey Government Speech?**

Although City states they use their Facebook page to "to promote its own activities and craft its own image" the City admits in its brief that the purpose of Facebook is "connecting and interacting with others." See Motion to Dismiss pg. 10. Generally these two concepts would not necessarily be adverse, unless you operate a Facebook page in the way that the City of Walnut Ridge has been operating their police department's page.

Governments have a history, albeit a relatively short one, of posting information on Facebook pages, however that is not government speech. Government speech occurs when the government is talking "at" you, not when the government is engaging a in an interactive forum. The City's posts generally elicited many comments from members of the community and the City could have deleted all comments after they were published and only used Facebook to present information. See https://www.facebook.com/help/www/297845860255949?helpref=faq_content. The City could have also only allowed posts to be viewed after they had been approved by an administrator which is common on many Facebook pages. See

2

https://www.facebook.com/help/www/248844142141117/?helpref=hc_fnav. The City could also have banned commenters from posting videos or photos, banned the use of profanity, or even tagging the city page from other pages. Id.

In addition to ignoring procedural safeguards built into the Facebook page the City could have developed a viewpoint-neutral commenting and posting policy, however they failed to do that as well, and instead instituted a no "negative comment" policy. See Plaintiffs' Exhibit B (Screenshot of Kirksey's policy). The City did not take these routes so we can reasonably infer that the purpose of the page was in fact "connecting and interacting with others" in a public forum in order to "promote its own activities and craft its own image" as the City claims.

To fully evaluate the history of this page and compare that with the history of other government Facebook pages, the Court would need to evaluate relevant posts by the City and relevant comments from the public, therefore a motion to dismiss is premature. We do know that positive "off topic" comments were indeed allowed. See Plaintiffs' Exhibit A (Screenshot of Walnut Ridge). Many police departments that maintain a Facebook page describe their pages as "limited public forums." For example, the largest police department in the state, the Little Rock Police Department.  This description seems to be pervasive throughout most department Facebook pages, a cursory search revealed the following police department Facebook pages (and many more) that declared themselves to be "limited public forums":

Jackson, Missouri Police Department page:

https://www.facebook.com/JacksonMissouriPD/posts/1632519430172204 ,

The Wilkes-Barre, The Pennsylvania Police Department Facebook Page:

https://www.facebook.com/pg/WBTPD/about/

The Georgia Tech Police Department Facebook page:

https://www.facebook.com/GaTechPD/app/208195102528120/?ref=page_internal

The Bourbonnais, Illinois Police Department Facebook page:

https://www.facebook.com/pg/BourbonnaisPolice/about/

The Highland Village, Texas Police Department Facebook page:

https://www.facebook.com/pg/HighlandVillagePolice/about/?ref=page_internal

The Colony, Texas Police Department Facebook page:

https://www.facebook.com/pg/TheColonyPoliceDepartment/about/

The Blytheville, Arkansas Police Department Facebook page:

https://www.facebook.com/pg/blytheville.dept/about/

It is unknown whether these police department pages attempted to create a limited public forum but actually created a public forum based on the rules of the page, nonetheless Walnut Ridge is certainly going against the history of government pages by declaring their page "government speech" as opposed to a limited public forum.

### ii.    Would a Reasonable Observer Conclude the Government was Speaking?

In Walker and Summum, the Supreme Court said license plates designs "are often closely identified in the public mind with the [State]." Summum, supra, at 472, 129 S. Ct. 1125. Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2248 (2015). The Court went

on to explain why a Confederate battle flag on a license plate might be considered speech by a

reasonable observer:

Each Texas license plate is a government article serving the governmental purposes of vehicle
registration and identification. The governmental nature of the plates is clear from their faces:
The State places the name "TEXAS" in large letters at the top of every plate. Moreover, the State
requires Texas vehicle owners to display license plates, and every Texas license plate is issued
by the State. See § 504.943. Texas also owns the designs on its license plates, including the
designs that Texas adopts on the basis of proposals made by private individuals and
organizations. See § 504.002(3). And Texas dictates the manner in which drivers may dispose of
unused plates. See § 504.901(c). See also § 504.008(g) (requiring that vehicle owners return
unused specialty plates to the State).

Id. at 2248.

On the platform Facebook, as you can see in all of Plaintiffs' exhibits, when a person

comments on a post their portrait and name appear beside their comment. See Plaintiffs' Exhibit

A. The speech of the person who made the comment is entirely inside a box and any user of the

platform would know this, and a person who is not a user of the platform would most likely not

be viewing a Facebook page. Any confusion could be cleared up with a blanket "disclaimer" in

every post that the any comments on the post are not necessarily the views of the department's.

The department could also single out particularly egregious comments and respond directly by

disavowing that viewpoint. Neither measure was taken here. No reasonable person who used

Facebook would confuse the third-party speech of those who comment on the page with that of

the main Facebook page.

### iii.    Does the Government Exercise Direct Control Over the Message?

In Walker the Court stated Texas law provides that the State "has sole control over the

design, typeface, color, and alphanumeric pattern for all license plates." Id. at 2249. The Board

must approve every specialty plate design proposal before the design can appear on a Texas plate. Id. Accordingly, like the city government in Summum, Texas had "effectively controlled' the messages [conveyed] by exercising 'final approval authority' over their selection." 555 U.S., at 473, 129 S. Ct. 1125 (quoting Johanns, 544 U.S., at 560–561, 125 S.Ct. 2055). Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2249, (2015).

The most important fact about Facebook pages is that a page may not prevent comments on its posts, it can only delete or hide the comments after they have been made. (citing *How do I control what visitors can post on my Page?* https://www.facebook.com/help/www/248844142141117/?helpref=hc_fnav ). "While you can't disable comments on your Page's posts, you can hide or delete individual comments." Id. This is important because it demonstrates that the Walnut Ridge Police Department never had control over the type of message that was being conveyed. They could retroactively "fix" any message, but the initial message was shown to the public and the page administrators at the same time. There was no "final approval authority" built into the Facebook platform. As referenced in section i, the City allowed pictures and videos to be posted even though the City could have restricted that form of expression with controls found in the "settings" portion of the page, and the City could have (and eventually did) remove the ability of users to comment on the general "timeline" of City's page, where Whitfield Hyman's original link and comment were posted. The City never had control of any message because the City did not even exercise the fullest amount of control that it had available, the City only censored comments after they had been made visible to the public, and the City had a commenting policy that was viewpoint discrimination.

iv.     **The 8th Circuit's Roach Test Has Not Been Overturned**

To determine whether speech is government speech, the 8th circuit has followed a four-point test set out by the other circuits after *Johanns*:

(1) the central "purpose" of the program in which the speech in question occurs;

(2) the degree of "editorial control" exercised by the government or private entities over the content of the speech;

(3) the identity of the "literal speaker"; and

(4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech.

Roach v. Stouffer, 560 F.3d 860, 865 (8th Cir. 2009).


**1.        Central Purpose**

"The primary purpose of Missouri's specialty plate program is to allow private organizations to promote their messages and raise money and to allow private individuals to support these organizations and their messages." Id. Although the City of Walnut Ridge states they use their Facebook page to "to promote its own activities and craft its own image" the City admits in its brief that the purpose of Facebook is "connecting and interacting with others." C.f. Doc. 6, pg. 1 with Doc. 6, pg. 10. Based on this information, it is easy to conclude that the "central purpose" factor puts the Plaintiffs' comments squarely in the private speech analysis, not government speech analysis.

## 2. Degree of Editorial Control

While it is true that the City of Walnut Ridge did regularly hide or delete comments from the Police Department's Facebook page, that does not mean that the "editorial control" tilts this factor in favor of the Defendant. The 8th circuit agreed with the 9th circuit when it quoted "de minimis editorial control over the plate design and color does not support a finding that the messages conveyed by the organization constitute government speech." Roach v. Stouffer, 560 F.3d 860, 866 (8th Cir. 2009).  "[T]he statutory requirements address[ed] who may speak, not what they may say." The Supreme Court determined that when "the government sets the overall message to be communicated and approves every word that is disseminated," the speech is government speech. Johanns v. Livestock Mktg. Ass'n., 125 S.Ct. 2055 (2005).

The City allowed up to dozens of comments on each post, in order for them to invoke this factor in their favor they would have to assert that they chose who spoke, chose which words each user specifically could use, and approved every word of every comment. That is not the case, therefore they did not have the degree of editorial control that is necessary to tilt this factor in their favor, and Plaintiffs' comments would be considered private speech under this analysis.

## 3. The Identity of the "Literal Speaker"

This is the most obvious factor that would not be in the Defendants' favor when evaluating whether speech is private or governmental. As you can see in the exhibits attached to the complaint in this case, on Facebook each comment has a name next to it along with a picture of the commenter. Clearly, the "literal speaker" in this case would be the private citizen, tipping

this factor in favor of evaluating the comments at hand as "private speech." See Doc. XX, Plaintiffs' Exhibit XX and XX.

### 4. Who Bears the Ultimate Responsibility for the Content of the Speech

Whether it be a defamation case or the criminal charge of terroristic threatening, obviously the ultimate responsibility of what is posted on the page would lie on the shoulders of the commenter, not of the governmental entity providing the forum.

### v. Summum and would not apply according to the Dissent in Walker

"[T]here is no history of landowners allowing their property to be used by third parties as the site of large permanent monuments that do not express messages that the landowners wish to convey. Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2259 (2015). However, social media is often a hub for lively debate. While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the "vast democratic forums of the Internet" in general... and social media in particular. Packingham v. North Carolina, 137 S. Ct. 1730, 1735, 198 L. Ed. 2d 273 (U.S. 2017) (internal citations omitted). As *Packingham* alludes, Facebook pages and profiles are often used for communication, argument, and debate.

"Spatial limitations played a prominent part in our analysis. 'Public parks can accommodate only a limited number of permanent monuments,' and consequently permanent monuments 'monopolize the use of the land on which they stand and interfere permanently with other uses of public space.'" Walker at 2239, 2259.

The amount of space allowed on a Facebook post or comment is unlimited. In fact, if a comment is too long, Facebook requires you to click "more" if you want to see that comment expanded. A Facebook user would not be able to monopolize an entire thread. In fact, the City could have had a rule of "no more than one comment per post per Facebook user" and that would have been Constitutional. However, the City chose to practice an illegal "viewpoint discrimination" policy.

vi.                    **The City of Walnut Ridge Created a Forum**

If the speech at issue not "government speech" and the speech is in a space controlled by the government, the speech is occurring in one of four types of forums created by the government: public forums, designated public forums, limited public forums, and nonpublic forums. See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 484, 129 S. Ct. 1125, 1127, 1140, (2009). Once it has opened a limited forum the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum… nor may it discriminate against speech on the basis of its viewpoint." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829, 115 S. Ct. 2510, 2517, 132 L. Ed. 2d 700 (1995). The Walnut Ridge Police Department had a set of rules for using the Facebook page which have only been referenced by the Defense and the Plaintiffs have a right to see those rules to determine whether or not they were violated or viewpoint neutral.

The type of forum created by Walnut Ridge is not important here, because the Plaintiffs have sufficiently plead viewpoint discrimination, which is impermissible in any of the forums created by a government entity. Id.

## A.   CHRIS KIRKSEY IS NOT ENTITLED TO QUALIFIED IMMUNITY

Kirksey bears the burden of proving that the  Plaintiffs' First Amendment rights were not clearly established. See, e.g., Siegert v. Gilley, 500 U.S. 226, 231, 111 S. Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991); Watertown Equip. Co. v. Norwest Bank Watertown, 830 F.2d 1487, 1490 (8th Cir.1987).  The Fourth Circuit has suggested that the government "of course" would open a forum for speech by creating a website that includes a " 'chat room' or 'bulletin board' in which private viewers could express opinions or post information," or that otherwise "invite[s] or allow[s] private persons to publish information or their positions." Page v. Lexington Cnty. Sch. Dist. One, 531 F.3d 275, 284 (4th Cir. 2008). Government Facebook pages are such websites. See: Davison v. Loudoun Cnty. Bd. of Supervisors, 267 F. Supp. 3d 702, 716 (E.D. Va. 2017). Plaintiff is not aware of any appellate court case law in state or federal court that has decided the fact specific inquiry of whether deleting Facebook comments on government owned and operated Facebook pages constitutes a violation of Constitutional rights. However, in order to pierce qualified immunity the plaintiffs are not required to give examples of this exact fact scenario having previously been litigated. In the light most favorable to the Defendants, the Facebook page in this case is at best a nonpublic-forum (if not a full-blown public forum). For example, in one case the 8th Circuit held that a history department display case was a nonpublic forum by focusing on facts that the display case was under the University of Minnesota-Duluth's

control, that UMD allowed members of the history club to use it upon request, and that the display case was dedicated to use of the UMD history department for disseminating information about the department. <u>Burnham v. Ianni</u>, 119 F.3d 668, 686–87 (8th Cir. 1997). *Burnham* does not reference any prior case with a remotely similar fact pattern, however they still found that the plaintiffs' could pierce the chancellor's qualified immunity for ordering that photographs depicting weapons be removed from a display case. <u>Id.</u> Although the right of free speech is not absolute, the First Amendment generally prevents the government from proscribing speech of any kind simply because of disapproval of the ideas expressed. <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382, 112 S.Ct. 2538, 2542–43, 120 L.Ed.2d 305 (1992). The analysis of whether a reasonable official should have known his conduct was unconstitutional should not rest on similar facts, but only on applying the facts to case law in order to determine which forum was created. Although the courts are generally more strict with similar case law on point with the actions of police officers when making arrests because the decisions often involve great bodily harm and must be made in the blink of an eye. That is not the case with static Facebook comments, at least not the comments presented in this case.

Courts have recognized a First Amendment interest in protecting speech about official misconduct is also a governmental interest, and there are circumstances in which that interest outweighs any other governmental interests that may be implicated. The instant case involves such circumstances. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.") (alteration in original) (internal quotation marks and citation omitted); <u>Brawner v. City of Richardson</u>, 855 F.2d 187, 192 (5th Cir.1988) (discussing, in the course of a Pickering balancing case, "the public's interest in the disclosure of misconduct or

malfeasance"). Courts have repeatedly emphasized the great First Amendment significance of speech bearing on official misconduct, "especially when it concerns the operation of a police department." Brawner, 855 F.2d at 191–92, quoted by Kinney v. Weaver, 367 F.3d 337, 361 (5th Cir. 2004). Due to the extensive case law that suppressing speech critical of police departments outweighs other government interests, Kirksey was on notice that deleting the Facebook comments and posts outweighed the government's interest in practicing "government speech."

In the Walnut Ridge case, it is important to have a factual background of what the video links actually displayed and the incidents they were trying to bring to light. See: https://youtu.be/pRbjc068wts , which eventually led to https://www.youtube.com/watch?v=dkf6OupAHFU , and https://www.youtube.com/watch?v=ulnhI2wChdQ . The subject of the video the Plaintiffs posted to the Walnut Ridge Police Department page was Adam Finley. citing: https://www.washingtonpost.com/news/the-watch/wp/2018/07/10/an-arkansas-man-complained-about-police-abuse-then-town-officials-ruined-his-life/ accessed on 10/30/2018.

In these three videos and subsequent reports, it became clear that Finley was falsely arrested, threatened, and poorly treated during an unconstitutional stop by a police officer who was employed by the Walnut Ridge Police Department. Id. When Finley went to file an official complaint about the incident, the first video was reviewed by Chris Kirksey and Finley was cited with two baseless crimes, presumably in retaliation for filing a complaint. Id. During that interaction, Kirksey appears to convince Finley's wife that Finley was in the wrong during the stop, and Finley's wife subsequently filed for divorce. Id. Finley's complaint was received by Mayor Snapp, and the offending officer was given a warning for the language he used during the

initial interaction, but no other disciplinary actions were taken at that time. Id. The egregiousness

of that scenario and the importance that it be heard far outweighed any other governmental

interest.

The Federal District Courts are littered with successful claims, in addition to the case

cited by the Defendants, there have been successful cases in Virginia, Hawai'i, Maine, and

Indiana. See: Davison v. Loudoun City. Bd. of Supervisors, 267 F. Supp. 3d 702, 716 (E.D. Va.

2017), Hawaii Def. Found. v. City & City. of Honolulu, No. CIV. 12-00469 JMS, 2014 WL

2804448, (D. Haw. June 19, 2014), Leuthy v. LePage, No. 1:17-CV-00296-JAW, 2018 WL

4134628 (D. Me. Aug. 29, 2018), and citing

https://www.indystar.com/story/news/2016/08/04/beech-grove-aclu-reach-settlement-facebook-c

ase/88075666/ accessed on 10/30/2018.

The District Court in *LePage* held "The Governor is correct that the government's own

speech is immune from First Amendment scrutiny,… however, he fails to persuade the Court on

this motion to dismiss that his speech is at issue in this case. Based solely on the allegations in

the Complaint, the Court must disagree with the premise that all of the information on the

Governor's Facebook page constitutes his speech. The posts on the Facebook page are labeled

with the name of the person who posted them, and the Governor's speech—his posts—is distinct

from the private citizen posts." ), Leuthy v. LePage, No. 1:17-CV-00296-JAW, 2018 WL

4134628 (D. Me. Aug. 29, 2018). *LePage* went further to decline to extend the legal reasoning in

*Morgan* and also noted that there were factual differences in the cases. Id. and  Morgan v. Bevin,

298 F. Supp. 3d 1003 (E.D. Ky. 2018). The district court in *Morgan* deemed the accounts

"privately owned channels of communication and are not converted to public property by the use of a public official." Id. at 1011.

Morgan is also distinguishable from this case, Governor Bevin stated that he blocks both positive and negative comments that are off topic. Id at 1003, 1008. Also the Court held that it was the governor's "personal" speech, because he is speaking on his own behalf, even if it was on his own behalf as a public official. Id at 1003, 1010–11. That analysis does not translate to this case where the Facebook page in question is the name of a governmental department (City of Walnut Ridge Police Department), the department is not an elected politician who may have greater or different levels of immunity regarding his suppression of speech, and the Governor was at least attempting to enforce the rules of a limited public forum. Id. Unlike our case, Governor Bevin has set up his Facebook Page so that members of the public cannot post on their own to his timeline, but can only respond to what he has posted. Morgan v. Bevin, 298 F. Supp. 3d 1003, 1008 (E.D. Ky. 2018). In this case, Whitfield Hyman was able to post on the general timeline of the City of Walnut Ridge Police Department, the department deleted that post, and then disabled everyone from being able to post on the general timeline. The Defendants' insinuation that the Plaintiff's first post was "off topic" is erroneous because that was not the reason for the deletion of the comments, we do not even know if that was against the written policy referenced by Kirksey. When it comes to the other characterizations of the Plaintiff's other comments as being off-topic, that is not the reason for the comments being deleted because we have evidence of the unconstitutional policy in Kirksey's comment and his reference to another heretofore unprovided "privacy" policy. See Plaintiff's Exhibit A (Kirksey Screenshot).

B.  __The City had an Unconstitutional Custom Policy or Practice of Illegally Deleting__
__Negative Comments__

In addition to deprivations of rights caused by official policy, local governments may be sued for deprivations caused by "governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." Monell v. New York City Department of Social Services, 436 U.S. 658, 690-92 (1978). To establish a custom or practice in the absence of a formal policy will usually require proof of repeated incidents suggesting a pattern or practice. The existence of a widespread practice can be so permanent and well-settled to constitute a custom or usage with the force of law. Id. See, e.g., Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987) (Custom or usage has force of law as "widespread practice" when "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the governing body [or policymaker with responsibility for oversight and supervision] that the practices have become customary among its employees.") "[T]he identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question" to be resolved by the trial judge before the case is submitted to the jury. Jett v. Dallas Independent School District, 491 U.S. 701, 797 (1989).

The jury then must determine whether those officials who have the power to make official policy caused the deprivation of rights by their decisions "or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity. Id. While the Defendants are correct that the single act of a non-policy maker does not constitute a custom or policy, that is not what is at issue here. In this case, we have at least four separate comments that have been deleted, and it is obvious from Kirksey's comment

16

that there are many more, dating back at least twenty-two weeks prior to the Plaintiffs' comments in this case being deleted. <u>See</u> Plaintiffs' Exhibit A (Kirksey Screenshot). There are at least two written policies regarding Facebook use by third-parties that were publicly available for anyone in city government to view at any time until the deactivation of the page. <u>Id.</u>

If Kirksey is not a policy maker, who wrote this policy that he is referencing? Was it acquiesced to or ratified by the City? Whether or not an employee is a "policymaker" is a legal distinction, but if Kirksey was allowed to write policies then he was a policymaker. We know there is a policy, who came up with the policy? Did this policy become a custom after being up for at least 22 weeks before the four comments in this case were deleted? Are we really supposed to believe that nobody in the city government other than Kirksey knew about this official policy? Until a factual inquiry is completed into why the other comments were deleted is complete, a judgment on the pleadings would be incomplete at this time. Even then, the very fact that Kirksey had made publicly available a policy that he may have written could be enough for the Plaintiffs' to be granted summary judgment.

## **CONCLUSION**

To dismiss Plaintiffs' complaint at this stage would be premature given that all reasonable inferences must be held in favor of the Plaintiffs. Furthermore, Plaintiffs' complaint goes beyond just stating bare legal conclusions and alleges all required legal elements as to the claims made.

The court assumes all factual allegations in the complaint to be true, giving the plaintiff full

benefit of the doubt.

WHEREFORE, the Plaintiffs respectfully request that this Court deny the Defendants'

motion to dismiss.


Respectfully submitted,
ATTORNEY FOR PLAINTIFFS


By: /s/Kesha Chiappinelli
Kesha Chiappinelli, #2009175
The Zaffino Law Firm
400 W. Capitol Ave. Suite 1700
Little Rock, AR  72201
(501) 492-3412 Telephone
(501) 897-6500 Facsimile
Kesha@ZaffinoLaw.com

**CERTIFICATE OF SERVICE**

I, Kesha Chiappinelli, hereby certify that on this 30th day of October 2018 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notice to counsel listed below:

John L. Wilkerson, ABA#2008046
Attorney at Law
P.O. Box 38
North Little Rock, AR 72115
Phone:  501-978-6136 Fax: 501-978-6567
Email: JWilkerson@arml.org

Lanny Richmond II, ABA#2015137
Attorney at Law
P.O. Box 38
North Little Rock, AR 72115
Phone:  501-537-3784 Fax: 501-537-7261
Email: LRichmond@arml.org                    /s/Kesha Chiappinelli ABN#2009175